Filed 8/28/13

CERTIFIED FOR PUBLICATION

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| HAROLD C. BAIN,<br><br>    Plaintiff and Appellant,<br><br>v.<br><br>TAX REDUCERS, INC.,<br><br>    Defendant and Appellant. | H037452<br>(Santa Clara County<br>Super. Ct. No. CV112065) |

Defendant and appellant Tax Reducers, Inc. (TRI), appeals from a judgment after a court trial in which the court awarded plaintiff and respondent Harold Bain damages for unpaid wages (Lab. Code §§ 202, 203, 1194, & 1194.2)[1] and for breach of contract based on a judicially supervised settlement of Bain's wage claim. TRI argues that the court erred when it (1) held that Bain's statutory wage claims were not barred by the statute of limitations; (2) applied the presumption that every person who performs services is presumed to be an employee; and (3) imposed statutory penalties pursuant to both sections 203 and 1194.2.

---

[1] All further statutory references are to the Labor Code, unless otherwise stated. Sections 203 and 1194.2 were amended after Bain left TRI. (Stats 2008, ch. 169, § 2; Stats 2011, ch. 272, § 2; see Historical and Statutory Notes, 44 West's Ann. Lab. Code (2011 ed.) foll. § 203, p. 335 & 44B West's Ann. Lab. Code (2013 supp.) foll. § 1194.2, p. 7.) The amendments do not affect our analysis. All further references to sections 203 and 1194.2 are to the statutory language in effect when Bain left TRI in February 2005.

Bain filed a cross-appeal challenging the court's rulings that James Brooks Griffin, TRI's president and majority shareholder, could not be held personally liable for Bain's wage claims.

On TRI's appeal, we hold that Bain's statutory wage claims under sections 202, 203, and 1194, which are subject to a three-year limitations period, were not time-barred because the limitations period was equitably tolled while Bain pursued his administrative claim before the Labor Commissioner. We conclude, however, that Bain's claim for the statutory penalty for failure to pay minimum wages under section 1194.2 was time-barred because it is subject to a one-year limitations period and Bain's complaint was not filed within one year of the date the action before the Labor Commissioner became final. Since Bain's claim for the section 1194.2 penalty was time barred, we hold the trial court erred when it imposed that penalty. We do not reach TRI's other contentions regarding the section 1194.2 penalty. We also hold that substantial evidence supports the trial court's finding that Bain was an employee under the multi-factor test in *S. G. Borello & Sons, Inc. v. Department of Industrial Relations* (1989) 48 Cal.3d 341 (*S. G. Borello*) and that there was no prejudicial error in the court's use of the presumption of employment. And we conclude that the trial court did not err in imposing a section 203 penalty for TRI's failure to timely pay final wages upon Bain's resignation.

On Bain's cross-appeal, we agree with the trial court that Griffin could not be held personally liable for Bain's wage claims; thus, the trial court did not err when it denied Bain's motion to amend the complaint to add Griffin as a defendant. Bain has also appealed the court's orders relating to attorney fees, which we discuss in a separate opinion filed concurrently herewith in Case No. H038002.

For the reasons stated below, we will modify the judgment to strike the $7,700 awarded to Bain as a penalty under section 1194.2. As so modified, we will affirm the judgment.

2

*Description of TRI*

TRI provides tax preparation and bookkeeping services to individuals and businesses. James Brooks Griffin has been the president and chief executive officer of TRI since 1997; Griffin owns two-thirds of the company's shares. TRI had three offices in Santa Clara County and decided to expand by purchasing another tax preparation practice. In December 2004, TRI purchased a tax preparation and accounting service in Los Altos known as Conard and Associates, which was owned by Paul Conard. Harold Bain worked for Conard from April 2002 until December 31, 2004. Since TRI agreed to bring Bain on in the same capacity as he worked for Conard, it is necessary to describe Bain's professional history with Conard as it relates to the question whether Bain was an employee or an independent contractor when he worked for TRI.

*Bain's Working Relationship With Conard & Associates*

Before going to work for Conard, Bain worked as an accountant. He attended training classes in tax preparation offered by the Voluntary Income Tax Assistance (VITA) program[3] and helped people do their taxes as a VITA volunteer, but he did not have a tax preparation business before working for Conard.

Bain did not bring any fee-paying clients with him when he started working for Conard, but he had a "couple" of friends, whose taxes he had previously done for free, who became Conard's clients. Bain did not have tax clients of his own while he worked for Conard or TRI. The only outside "client" Bain had was the Los Altos Masonic

---

[2] Except as otherwise noted, the facts are based on evidence presented at trial.

[3] Although the program name suggests the acronym "VITA," Bain used the acronym "VITAN" at trial. We shall use the acronym "VITA," which is consistent with the program name.

Temple Association (LAMTA). Bain did LAMTA's tax return as part of his duties as a member of its board.

When Bain started working for Conard, they agreed that he would be an independent contractor and that Conard would pay him $1,100 for 32 hours of work per week. If Bain worked less than 32 hours in a week, Conard paid him on an hourly basis, based on the $1,100 weekly rate ($1,100 per week ÷ 32 hours = $34.38 per hour). If Bain worked 32 hours or more a week, Conard paid him the $1,100 weekly salary. Initially, Bain prepared an invoice for Conard and was paid every two weeks. Conard did not make any withholdings from Bain's pay and reported Bain's income as "non-employee compensation" on a 1099 form. Since Conard issued him a 1099 form, Bain reported his income to the IRS on a Schedule C (Profit or Loss From Business) form. Bain and Conard did not have a written agreement describing their relationship.

While working for Conard, Bain went through the examination and investigation process necessary to become an "enrolled agent" with the IRS. After obtaining that certificate, Bain was authorized to appear before the IRS. Bain's status as an enrolled agent did not require that he work as an independent contractor.

Bain's duties at Conard and Associates evolved over time and eventually included setting up and dissolving corporations, and consulting on and maintaining computer networks. Bain helped Conard with advertising, pricing, hiring employees, and selecting clients; he managed the office when Conard was gone.

In the summer of 2004, Bain and Conard attended a seminar on the tax implications of using employees versus independent contractors. During the seminar, they both realized that Bain was actually an employee of Conard and Associates, not an independent contractor. They agreed to continue their relationship as usual until the end of 2004 and that Conard would begin withholding taxes and treating Bain as an employee beginning January 1, 2005. On July 9, 2004, Bain stopped giving Conard invoices for his

services and began reporting his time on the same time sheet used by Conard's employees.

### *Bain's Working Relationship with TRI*

In December 2004, one month before the date Conard had agreed to begin treating Bain as an employee, Bain and Conard's other two employees learned that Conard had sold his practice to TRI. They were worried about their jobs, so they asked Bain to represent them at a meeting with the new owner and to ask whether they would still have jobs after January 1, 2005.

Bain met with Griffin in mid-December 2004. At that meeting, Griffin told Bain they would all have jobs after January 1, 2005, and would be paid the same as before. Griffin said he had no interest in terminating the others, but said he was not sure he would be able to retain Bain past tax season because he thought Bain was too expensive. Bain made a suggestion for increasing revenue to justify keeping him on. Bain and Griffin did not discuss whether Bain would be an independent contractor or an employee.

After TRI acquired Conard and Associates, Bain and the other former Conard employees continued working in the same office space Conard had occupied. By January 2, 2005, no one had received a job application from TRI. That day, Bain put together a packet consisting of a W-4 form (withholding certificate), an I-9 immigration form (Employment Eligibility Verification), and copies of his enrolled agent certificate, his social security card, and his passport. Bain placed the packet on Griffin's desk. Griffin denied receiving those documents.

In January 2005, Bain attended at least three meetings with Griffin and other staff in which Griffin presented new tax software, demonstrated the software, and gave a presentation on TRI, describing the Conard acquisition as a "high end tax preparation office." Bain went to the same meetings as other staff members, as Griffin told Bain to attend all staff meetings.

Griffin testified that tax preparation was the essential function of TRI's business. Bain's duties at TRI included preparing tax returns, bookkeeping services for clients, computer network maintenance, meeting with prospective new clients, researching tax questions, training other staff, attending continuing education meetings, answering phones, assembling tax returns, and filing.

After they started working for TRI, Griffin instructed Bain and the other former Conard employees to continue using the same weekly time sheets they had used while working for Conard. On the time sheets, the staff recorded the total number of hours worked each day, as well as information about the specific tasks accomplished, for both time that was billable to clients and non-billable time. The billable time entries included the name of the client, the type of task performed, the date, and the amount of time attributable to each task. Thus, the time sheets were used both as a time card and to record information that was used to bill clients. Bain and the other staff members recorded their time daily and turned their time sheets in to Griffin weekly. Bain never invoiced TRI separately for his time. TRI paid the other staff members, but not Bain, every two weeks beginning in mid-January 2005.

After TRI acquired Conard and Associates, Bain no longer performed management functions; those were assumed by Griffin. Bain testified that Griffin was his supervisor. Griffin testified that he controlled how the Los Altos office operated. In addition, all the tax returns Bain prepared were reviewed by TRI's night auditor, who reviewed the work done by all of TRI's tax preparers. After the night auditor reviewed Bain's returns, he left a list of things that needed to be corrected or researched further. Griffin told Bain that he had to follow the auditor's instructions until he and the auditor came to a mutual resolution of the issues involved.

Bain did not operate an independent tax business while working for TRI. He did not maintain a separate office for a tax preparation business, advertise his tax preparation services, have his own website, have his own employees, or buy errors and omissions

6

coverage. TRI provided Bain with a business card. Bain worked for TRI on TRI's premises. TRI established the office hours (8:00 a.m. until 5:00 p.m.) and Griffin told the staff he expected them to be in the office during those times. According to his time sheets, Bain generally started work between 7:30 and 8:30 a.m. and left between 4:00 and 5:30 p.m. During the seven weeks Bain worked for TRI, he took one sick day, plus time off for a doctor's appointment and for personal business; each time, he discussed the time-off request with Griffin. Bain did not pay for the office space he used at TRI. TRI gave Bain a set of keys to the office, just like it did other employees. When expanding his business, Conard did not have a lot of money, so Bain lent him a desk, a chair, a wall unit, and a printer stand, which Bain used in his office. Bain continued to use his own office furniture after TRI purchased the practice. Bain purchased his own keyboard and computer mouse, which he preferred over the ones Conard provided. TRI owned the rest of the office furniture, the computers, the photocopier, the filing cabinets, and the phones. TRI provided all of the office supplies.

TRI controlled which clients Bain saw. Griffin took over at least one individual client that Bain had previously handled; he told Bain that he wanted him to work primarily on corporate and partnership returns and more complex individual returns. TRI established the rate schedule and billed the clients. However, the tax preparers determined which rate to charge from the schedule, based on the scope and breadth of the services provided.

At the end of January 2005, Bain asked Griffin when he would be paid. On February 5, 2005, Griffin left an independent contractor agreement on Bain's desk. The agreement proposed paying Bain $27.50 per hour (less than what Conard had paid) and terminating Bain's services on June 30, 2005. Bain believed he was an employee and Griffin was trying to change his status from employee to independent contractor. Bain found the agreement unacceptable and returned it to Griffin with a note that stated, "Let's do employee status without a ten percent reduction." Later, Bain and Griffin discussed

7

the independent contractor agreement. Griffin explained that he got the $27.50 hourly rate by dividing Bain's weekly rate ($1,100) by 40 hours. Bain explained that his pay was based on a 32-hour week and told Griffin that he was supposed to be an employee, not an independent contractor. Griffin said he would discuss the matter with Conard.

Bain resigned from TRI on Friday, February 18, 2005. In his resignation letter, Bain stated that since TRI had failed to pay him for seven weeks and failed to reimburse him for expenses he had submitted, Bain did not "feel it necessary to give the customary two week notice." Bain told Griffin he would remove his belongings from the office by Sunday, February 20, 2005.

Griffin responded to Bain's letter in writing on February 19, 2005. Griffin presented Bain with a modified independent contractor agreement in which he agreed to pay Bain $1,100 per week for seven weeks of work. Griffin's letter stated that before TRI would pay Bain, Bain would have to sign the modified independent contractor agreement and to provide information about work in progress, a missing client file, and the segregation of TRI software from Bain's personal software. Griffin left the letter and the modified agreement on Bain's desk. Bain saw the letter and the agreement on February 20, 2005. Bain did not sign the modified agreement because he believed it changed his employment conditions retroactively and restricted his ability to work.

On March 1, 2005, Bain filed a claim for his unpaid wages and expenses with the California Labor Commissioner. On March 17, 2005, Bain sent TRI a letter demanding his unpaid wages and expenses. On March 23, 2005, Griffin sent Bain a letter stating that TRI's offer to pay $7,700 in wages "still stands." But, Griffin did not tender a check. TRI has never paid Bain for his work. Griffin testified he never paid Bain because they could not reach an agreement for him to be paid.

8

Because of the statute of limitations issues presented, including the question of equitable tolling, we shall describe the complex procedural history of this case.

*Proceedings Before the Labor Commissioner*

In his complaint before the Labor Commissioner, Bain claimed $7,700 in unpaid wages, $157.26 for unpaid expenses, and $6,600 in waiting time penalties ($220 per day for 30 days; § 203), plus interest. Bain represented himself in the proceedings before the Labor Commissioner.

TRI filed a written response, which alleged that Bain was not entitled to wages or penalties because he was never an employee and because his "sole relationship to [TRI] was business to business." TRI alleged Bain never filled out an employment application or W-4 forms and refused to sign an independent contractor agreement. Griffin admitted that TRI had several employees and that Bain was the only one he considered to be working as an independent contractor. TRI argued that even if Bain was an employee, the parties never agreed to an amount to be paid as wages and that Bain was therefore "entitled to minimum wage and no more." TRI contended that Bain was not entitled to penalties under section 203 because he was never an employee and had "rebuffed multiple attempts to finalize the contract and get paid." TRI also argued that it would be "unconscionable" to allow Bain to "profit . . . from his intransigence" and urged the department to "decline to intervene in this contractual dispute."

The Labor Commissioner conducted a hearing on March 9, 2006, more than a year after Bain filed his claim. Griffin appeared on behalf of TRI at the hearing and gave Bain a check for $157.26 to cover his business expenses. The hearing officer found that although TRI considered Bain an independent contractor, Bain did not meet the criteria established in section 2750.5 for independent contractor status, and concluded that the

parties had an employer-employee relationship. The hearing officer awarded Bain $7,700 "for wages (with lawful deductions)," $805.86 in interest (§ 98.1), and $6,600 in waiting time penalties (§ 203), for a total award of $15,105.86.

*First Action in the Superior Court (TRI's Appeal of Labor Commissioner's Decision)*

TRI retained counsel and appealed the Labor Commissioner's decision to the superior court (Santa Clara County Superior Court Case No. 1-06-CV063080). Although labeled an "appeal," the proceedings in the superior court are actually a trial de novo, in which the decision of the Labor Commissioner is not entitled to any weight. (*Murphy v. Kenneth Cole Productions*, *Inc*. (2007) 40 Cal.4th 1094, 1116 (*Murphy*).) As required by section 98.2, subdivision (b), TRI deposited $15,105.86 (the amount of the Labor Commissioner's award) with the superior court. Bain retained counsel of his own and the case was initially set for trial on July 24, 2006.

### Efforts to Settle in July 2006

In July 2006, the parties agreed to settle the case for $9,791, which included $7,700 for Bain's wage claim, $1,000 for attorney fees, and $1,091 in interest. TRI gave notice of the settlement to the court and the trial date was vacated. Later, however, they were unable to agree on the scope and terms of a written release. The parties disputed whether the settlement included a release of all claims or just the wage claim that was adjudicated before the Labor Commissioner. There were additional issues between the parties, including a non-competition claim and a defamation claim by Bain, which was based on things Griffin said about Bain after he left TRI. At one point, Bain offered to execute a general release of all claims in exchange for an additional $1,250 and TRI's promise not to contest his status as an employee in response to inquiries about his employment. TRI never agreed to those terms.

10

**Judicially Supervised Settlement in December 2006**

After settlement failed, the case was re-set for trial on December 11, 2006.  On the first day of trial, the parties settled the case in a judicially supervised proceeding.  The terms of the settlement were placed on the record, as follows:  "Case will be settled by the defendant making a total payment of $17,700.  The parties will provide mutual general releases including [Civil Code section] 1542 releases to the parties and the officers, employees, attorneys, agent, etc. anyone, anyone acting on behalf of either of the parties."  The parties stipulated to an order for the immediate release of the bond.  TRI agreed to make two payments by January 31, 2007 of $7,700 to Bain and $10,000 to Bain's attorney.  The parties agreed that the payments would be made "without deduction for taxes or withholdings.  And Mr. Bain will indemnify the company against any tax claims."  TRI agreed that if it is "contacted and requested to confirm Mr. Bain's having worked there, the company will confirm that Mr. Bain worked with the company in January and February of 2005 and that he was paid $1,100 a week."  Both Bain and Griffin agreed to the terms of the settlement on the record.  The court told TRI how to obtain release of the bond money and set the case for a dismissal review hearing on February 8, 2007.  The court did not retain jurisdiction over the settlement.

**Release of the Bond, Problems With the Written Release, & Dismissal of the Action**

On or about December 29, 2006, the court issued TRI a check for $15,532.34 (the amount deposited with the court, plus interest).  Although TRI expected Bain to sign a written release as part of the settlement, TRI's counsel did not prepare a release any time prior to January 31, 2007, the date agreed upon for payment of the settlement proceeds.  Griffin said he expected Bain's counsel to prepare the release, even though the parties had not agreed to that, because Griffin did not want to pay his lawyer to do it.

11

TRI's counsel forwarded a proposed release agreement to Bain's counsel in March 2007 and the parties disputed the language of that release for a number of months. On January 10, 2008, Bain's counsel prepared a proposed release and forwarded it to TRI's counsel. Although Griffin testified that the January 2008 release was consistent with the terms of the settlement that had been placed on the record, he stated he never saw that release. But Griffin testified that he would not have signed the January 2008 release because it was "invalid" since it required payment by January 31, 2007, a date that had long passed. This became a point of contention between the attorneys. TRI's attorney demanded that the term requiring tender of the $17,700 by January 31, 2007 be changed to "within 10 days of execution" of the release by Bain. Bain's attorney agreed to do so if TRI paid Bain interest from January 31, 2007; otherwise, he would file a motion to enforce the settlement agreement under Civil Code section 664.6. TRI refused to pay interest, arguing that Bain would not be awarded interest if the court ordered enforcement of the settlement agreement.

Bain's counsel later determined that the case had been dismissed at the dismissal review hearing on February 8, 2007, and that the court no longer had jurisdiction to enforce the settlement under Civil Code section 664.6. Bain therefore sought to enforce the settlement by filing a second action in the superior court.

***Second Action in the Superior Court (Bain's Action to Obtain Monies Owed)***

**Pre-trial Proceedings**

Bain filed the instant action on May 7, 2008. The complaint contained causes of action to enforce the December 2006 judicially supervised settlement, for breach of contract based on that settlement, for money had and received, to recover wages based on violations of the Labor Code, and for conversion of the bond money. TRI filed a cross-complaint alleging breach of contract based on the July 2006 settlement.

TRI filed three motions at the pleading stage.  Its demurrers to the first four causes of action in the original complaint were overruled, but its demurrer to the conversion claim was sustained with leave to amend.  TRI then responded to Bain's first amended complaint with a special demurrer on the ground of uncertainty and a special motion to strike the causes of action for Labor Code violations and for conversion as a strategic lawsuit against public participation (Code Civ. Proc., § 425.16), otherwise known as an anti-SLAPP motion.  (*Equilon Enterprises v. Consumer Cause, Inc*. (2002) 29 Cal.4th 53, 57.)  TRI argued that those two causes of action were barred by the litigation privilege (Civ. Code, § 47) because they were both based on the release of the bond.  Bain opposed the anti-SLAPP motion, arguing that it was "another delay tactic to avoid paying the 2005 wages and the 2006 settlement."

The court overruled the special demurrer, denied the special motion to strike, and denied both parties' requests for attorney fees for the special motion to strike.  TRI appealed the trial court's order on the special motion to strike to this court.  We affirmed the trial court's order in an unpublished opinion.  (*Bain v. Tax Reducers, Inc*. (May 17, 2010, H033632).

In September 2010, Bain amended his first amended complaint to name Griffin, individually, as a Doe defendant.  According to Bain's counsel, the amendment was prompted by the Supreme Court's May 2010 decision in *Martinez v. Combs* (2010) 49 Cal.4th 35 (*Martinez*), which Bain's counsel contends "re-defin[ed] the term 'employer' under the Labor Code."

The parties engaged in discovery, which generated four discovery motions in the trial court.  Each of the parties then sought summary judgment or summary adjudication.  Bain filed a motion for summary adjudication of his cause of action alleging Labor Code violations.  TRI sought summary adjudication of two causes of action.  It argued that the cause of action for Labor Code violations and wages due was barred by the statute of limitations and by Bain's election to enforce the settlement agreement in the prior

13

lawsuit.  TRI asserted that the conversion claim failed because:  TRI's actions were privileged, Bain consented to release of the bond, Bain never demanded the bond money or asked TRI to redeposit it with the court, and Bain was never entitled to that money. Griffin filed a motion for summary judgment, arguing that he was not personally liable for Bain's claims.

The trial court denied Bain's and TRI''s motions for summary adjudication, but it granted Griffin's motion for summary judgment.  Regarding Griffin's motion, the court observed that Bain had conceded that Griffin was not liable on his first three causes of action.  The court concluded that Griffin had met his initial burden of demonstrating that there were no triable issues of material fact regarding (1) the claim for Labor Code violations "as [Griffin] was not Bain's employer but rather a corporate officer of TRI," and (2) the conversion claim, since the "bond funds were released to TRI and [Griffin] did not personally receive the bond funds at issue."

**Trial & Statement of Decision**

The court conducted a four-day court trial in April and May 2011.  At trial, the court denied Bain's request to amend his complaint to add Griffin as a defendant on the theory that Griffin was individually liable for Bain's wages.  At trial, Griffin testified that he did not intend to pay Bain absent a court order.

The court filed a 21-page statement of decision, which contained findings of fact and conclusions of law.  The court found that "TRI operated as employer" and "Bain was its employee, and [TRI] employed Bain to perform the integral functions of a tax preparer for the business."  The court found that TRI's labeling Bain an "independent contractor" and Bain's receipt of a 1099 form from Conard and his filing of a Schedule C while employed by Conard had no legal effect on his status as an employee.  The court concluded that Bain's statutory wage claims were governed by the three-year limitations

14

period in Code of Civil Procedure section 339 subdivision (1)[4] and that the claims were not barred by the statute of limitations because TRI had agreed to pay wages on January 31, 2007, as part of the December 2006 settlement agreement. Alternatively, the court held that Bain was entitled to rely on the doctrine of equitable tolling because he had "consistently pursued his remedies in multiple fora, including trying to resolve the issues without resort to Court again" and TRI was not prejudiced by the delay. The court found that there was no conversion of the bond funds because Bain had not established that he was entitled to the money when it was released by the court and had not presented any evidence that he ever asked TRI to return the money to him or to the court. The court denied relief on TRI's cross-complaint for breach of contract, reasoning that there was no meeting of the minds regarding the terms of a settlement agreement at that time and that the December 2006 settlement was an accord and satisfaction of any claims TRI may have had based on the July 2006 negotiations.

After trial, the court made two alternative awards from which Bain could choose when he prepared the judgment. As a first alternative, the court awarded Bain the following on his causes of action based on the December 2006 settlement: $7,700 as wages; $10,000 as attorney fees; and $7,669.94 as statutory 10 percent interest on both amounts from January 31, 2007 through May 31, 2011. These awards amounted to a total of $25,369.94, plus costs of suit. Alternatively, on the fourth cause of action for violations of the Labor Code, the court awarded Bain: $7,700 in unpaid wages (§ 201-202), $6,600 in penalties for intentionally withholding wages (§ 203), $7,700 as liquidated damages for failure to pay at least minimum wages (§§ 1194, 1194.2), and

---

[4] Code of Civil Procedure section 339, subdivision (1) provides that the limitations period for an action based on an oral contract is two years. Although the court cited Code of Civil Procedure section 339, subdivision (1), it likely meant Code of Civil Procedure section 338, subdivision (a), which provides that the limitations period for an "action based on a liability created by statute" is three years. The parties do not address this apparent error in the statement of decision.

15

$3,368.75 in prejudgment interest at the rate of seven percent on $7,700 for February 19, 2005 through May 28, 2011, for a total of $25,368.75. The court also awarded Bain attorney fees and costs.

TRI filed objections to the statement of decision, which the court rejected. Bain elected the remedy provided by his fourth cause of action and the court entered judgment for Bain on August 15, 2011.

Both sides appealed. After the notices of appeal were filed, Bain filed a motion for attorney fees and costs. Bain claimed "Lodestar Fees" totaling $276,235 based on 470.2 hours of attorney time and 92.75 hours of paralegal time. Bain also argued that he was entitled to "an enhancement factor of 1.5, for a total of $414,352.5 . . . due to [TRI's] insistence on overly zealous and vigorous litigation, and re-litigation of certain issues, and [its] refusal to settle this matter given the admission that [it] did not pay Bain." Griffin filed a motion for attorney fees based on his successful motion for summary judgment. The court's order on the attorney fees claims is the subject of a separate appeal in *Bain v. Tax Reducers*, Court of Appeal Case No. H038002.

## DISCUSSION

TRI argues that the court erred (1) when it held that the action was not barred by the statute of limitations; (2) when it applied the presumption that every person who performs services is presumed to be an employee; and (3) when it imposed statutory penalties pursuant to sections 203 and 1194.2. Bain filed a cross-appeal challenging the court's rulings on (1) Griffin's motion for summary judgment and (2) Bain's motion to amend his complaint at trial to add Griffin as a defendant.

## I. TRI's Appeal

### A. Statute of Limitations

TRI contends that the applicable statute of limitations bars Bain's recovery of monies owed. Although not expressly stated in TRI's opening brief, it appears this contention is limited to Bain's fourth cause of action for violations of the Labor Code arising out of TRI's failure to pay wages. TRI's opening brief does not argue that the contract-based causes of action to enforce the settlement agreement were time barred.

Regarding the wage claims, TRI observes that there was no written employment contract between the parties and argues that the limitations period on an action based on an oral contract is two years under Code of Civil Procedure section 339, subdivision (1).[5] Alternatively, TRI argues that Bain's claim for unpaid minimum wages is a statutory claim based on section 1194 and that it is therefore governed by the three-year limitations period in Code of Civil Procedure section 338. Bain filed this action on May 7, 2008. TRI argues: "Counting back two years from May 7, 2008, all claims for amounts due on an oral contract before May 7, 2006 are barred. Counting back three years . . . , all claims based upon a statute for payments due before May 7, 2005 are barred. Since [Bain] claims he is owed payments that were due no later than February 18, 2005, all of these claims are barred, whether they are 'contract payments' or 'wages.' "

The trial court disagreed with TRI's analysis. The court held that the "statute of limitations for any violation of the Labor Code regarding wages is three years," and that Bain's claims were not barred by the statute of limitations because (1) Bain was entitled to rely on the doctrine of equitable tolling; and (2) the three-year limitations period began to run on January 31, 2007, the date TRI had promised to pay wages under the settlement

---

[5] Code of Civil Procedure section 339, subdivision (1) provides that the limitations period for "[a]n action upon a contract, obligation or liability not founded upon an instrument of writing" is "two years."

17

agreement. TRI challenges each of the court's holdings regarding the statute of limitations.

### 1. Three-Year Limitations Period for Bain's Claims Based on Labor Code Sections 201, 203 and 1194

We begin by determining the applicable limitations period. Contrary to TRI's assertion, Bain sought more than unpaid minimum wages (§ 1194) in his fourth cause of action for violations of the Labor Code. Bain's first amended complaint alleged violations of section 201 (failure to immediately pay wages upon discharge[6]), section 203 (penalty for failure to pay wages as required by sections 201 or 202), and sections 1194 and 1194.2 (failure to pay minimum wages).

Generally speaking, a cause of action based on a wage liability created by statute must be commenced within three years after the cause of action has accrued. (*Cuadra v. Millan* (1998) 17 Cal.4th 855, 859 (*Cuadra*), disapproved on other grounds in *Samuels v. Mix* (1999) 22 Cal.4th 1, 16, fn.4; Code Civ. Proc., § 338, subd. (a).) "A cause of action for unpaid wages accrues when the wages first become legally due, i.e., on the regular payday for the pay period in which the employee performed the work; when the work is continuing and the employee is therefore paid periodically (e.g. weekly or monthly) a separate and distinct cause of action accrues on each payday, triggering on each occasion

---

[6] Section 201 provides in relevant part: "If an employer discharges an employee, the wages earned and unpaid at the time of discharge are due and payable immediately." Section 202 provides in part: "If an employee not having a written contract for a definite period quits his or her employment, his or her wages shall become due and payable no later than 72 hours thereafter, unless the employee has given 72 hours previous notice of his or her intention to quit, in which case the employee is entitled to his or her wage at the time of quitting." Although Bain's first amended complaint claimed a violation of section 201, it did not mention section 202. Arguably his claim was governed by section 202, since he resigned from TRI (§ 202) and was not terminated (§ 201). The trial court awarded Bain his unpaid wages, citing both sections 201 and 202 and TRI does not challenge that conclusion. Since Bain resigned without giving 72 hours notice, his unpaid wages were due within three days after he resigned, or no later than February 21, 2005. To this day, more than eight years later, TRI has never paid Bain.

18

the running of a new period of limitations." (*Ibid.*) In view of this rule, we agree with TRI's contention that the trial court erred when it concluded that the limitations period began to run on January 31, 2007, the date the wage payment was due under the December 2006 settlement agreement.

More specifically, "[a]ctions for final wages not paid as required by sections 201 and 202 are governed by Code of Civil Procedure section 338, subdivision (a), which provides that a three-year statute of limitations applies to '[a]n action upon a liability created by statute, other than a penalty or forfeiture.' " (*Pineda v. Bank of America, N.A.* (2010) 50 Cal.4th 1389, 1395.) The same three-year limitations period applies to Bain's claim for section 203 penalties. (*Id*. at p. 1398; § 203.) Bain's statutory minimum wage claim (§ 1194) is also governed by the three-year limitations period, since it is a liability created by statute. (See *Aubry v. Goldhor* (1988) 201 Cal.App.3d 399, 404 [section 1194 claim for overtime compensation subject to three-year limitations period in Code Civ. Proc., former § 338, subd. (1), now § 338, subd. (a)].)

### 2. *One-Year Limitations Period for Bain's Claim Based on Labor Code Section 1194.2 (Liquidated Damages)*

However, a different limitations period governs Bain's claim for liquidated damages under section 1194.2. In their initial briefing, both parties assert that all of Bain's wage claims, including the claim for liquidated damages under section 1194.2, are subject to a three-year limitations period. We requested supplemental briefing from the parties on the question whether Bain's section 1194.2 claim is subject to the three-year limitations period for a liability created by statute (Code Civ. Proc., § 338, subd. (a)) or the one-year limitations period for a statutory penalty (Code Civ. Proc., § 340, subd. (a)). As we shall explain, we conclude that the section 1194.2 claim is subject to the one-year limitations period for statutory penalties in Code of Civil Procedure section 340, subdivision (a).

19

Section 1194.2 provides in relevant part: "(a) In any action under . . . Section 1194 to recover wages because of the payment of a wage less than the minimum wage fixed by an order of the commission, an employee shall be entitled to recover liquidated damages in an amount equal to the wages unlawfully unpaid and interest thereon." "The 'liquidated damages' allowed in section 1194.2 are in effect a penalty equal to the amount of unpaid minimum wages."[7] (*Martinez*, *supra*, 49 Cal.4th at p. 48, fn. 8.)

The three-year limitations period in Code of Civil Procedure section 338, subdivision (a), applies to an "action upon a liability created by statute*, other than a penalty or forfeiture*." (Italics added.) Code of Civil Procedure section 340, subdivision (a) provides that the limitations period "upon a statute for a penalty" is one year, "except if the statute imposing it prescribes a different limitation." Although both sections 203 and 1194.2 impose penalties, the court in *Pineda* concluded that the longer three-year limitations period in Code of Civil Procedure section 338, subdivision (a) applies to claims for section 203 penalties since section 203 provides that "[s]uit may be filed for these penalties at any time before the expiration of the statute of limitations on an action for the wages from which the penalties arise" and thereby expressly prescribes a different limitations period. (*Pineda*, *supra*, 50 Cal.4th at p. 1395.)

Unlike section 203, nothing in section 1194.2 "prescribes a different limitation[s]" period or otherwise exempts section 1194.2 from the one-year limitations period in Code of Civil Procedure section 340, subdivision (a). Absent an express authorization to apply a different limitations period, we conclude that the one-year limitations period in Code of Civil Procedure section 340, subdivision (a) applies to Bain's claim for section 1194.2 penalties.

---

[7] The plain text of section 1194.2 applies to "the payment of a wage" that is less than the current minimum wage. Here, no wage was paid to Bain. But we need not determine whether section 1194.2 could provide relief under these circumstances because: (1) the one-year statute of limitations had expired; and (2) the parties do not raise this point.

### 3. *Equitable Tolling Applies*

Bain's claims accrued no later than February 18, 2005, the last day he worked for TRI. Bain filed his complaint on May 7, 2008, more than three years after that date. His statutory wage claims, whether subject to the three-year limitations period or the one-year limitations period, would therefore be barred, unless Bain can demonstrate that the limitations period was equitably tolled.

The most recent Supreme Court case to discuss the equitable tolling doctrine is *McDonald v. Antelope Valley Community College District* (2008) 45 Cal.4th 88 (*McDonald*). "Broadly speaking, the doctrine applies ' "[w]hen an injured person has several legal remedies and, reasonably and in good faith, pursues one." ' [Citations.] Thus, it may apply where one action stands to lessen the harm that is the subject of a potential second action; where administrative remedies must be exhausted before a second action can proceed; or where a first action, embarked upon in good faith, is found to be defective for some reason. [Citation.]" (*Id.* at p. 100.) "Equitable tolling is a fact intensive issue and it is determined based upon evidence. Accordingly, we are compelled to affirm the trial court's [order based on that] theory if there is substantial evidence to support its determination." (*Thomas v. Gilliland* (2002) 95 Cal.App.4th 427, 434 (*Thomas*).)

In addition, "equitable tolling may extend even to the voluntary pursuit of alternate remedies." (*McDonald*, *supra*, 45 Cal.4th at p. 101.) In *Campbell v. Graham-Armstrong* (1973) 9 Cal.3d 482, 490 the court held that "[t]he exhaustion of administrative remedies will suspend the statute of limitations *even though no statute makes it a condition of the right to sue*." In *Elkins v. Derby* (1974) 12 Cal.3d 410, 414 (*Elkins*), the court "rejected the assertion that equitable tolling should be limited to cases in which a plaintiff was required to pursue a particular alternate remedy before initiating suit, and instead espoused 'the principle that regardless of whether the exhaustion of one

21

remedy is a prerequisite to the pursuit of another, if the defendant is not prejudiced thereby, the running of the limitations period is tolled.' " (*McDonald*, at pp. 101-102, citing *Elkins* at p. 414.)

In *Addison v. State of California* (1978) 21 Cal.3d 313, our high court "confirmed that equitable tolling applies equally to the voluntary pursuit of alternate remedies against public defendants."[8] (*McDonald*, *supra*, 45 Cal.4th at p. 102.) The *Addison* court stated that the equitable tolling rule requires a showing of three elements: " 'timely notice, and lack of prejudice, to the defendant, and reasonable and good faith conduct on the part of the plaintiff.' " (*McDonald*, at p. 102, citing *Addison*, *supra*, at p. 319.) Finally, in *Jones v. Tracy School Dist.* (1980) 27 Cal.3d 99, 107-109, the court reversed a summary judgment on the ground that equitable tolling may apply to the limitations period for a wage discrimination claim (§ 1197.5) while the plaintiff pursued a related claim under the federal Fair Labor Standards Act.

Bain had two concurrent remedies to recover his unpaid wages. He could "seek judicial relief by filing an ordinary civil action against the employer for breach of contract and/or for the wages prescribed by statute" or he could seek administrative relief by filing a wage claim with the Labor Commissioner. (*Reynolds v. Bement* (2005) 36 Cal.4th 1075, 1084-1085 (*Reynolds*).) Bain decided to pursue administrative relief and filed his claim with the Labor Commissioner on March 1, 2005, eleven days after he resigned from TRI. Although the pursuit of his administrative claim was not a prerequisite to filing a judicial action, that does not bar a finding of equitable tolling. (*McDonald*, *supra*, 45 Cal.4th at p. 101; *Murphy, supra,* 40 Cal.4th at p. 1117.) TRI filed a written response and, about one year later, in March 2006, the parties went to trial before a hearing officer for the Labor Commissioner. The Labor Commissioner found for Bain and served its decision and order on the parties on April 21, 2006. On or about

---

[8] This case does not involve a remedy against a public defendant, but it did involve the filing of a wage claim with the Labor Commissioner.

22

May 5, 2006, TRI filed its appeal from the Labor Commissioner's decision in the trial court. Such an appeal "is neither a conventional appeal nor review of the Labor Commissioner's decision, but is rather a de novo trial of the wage dispute." (*Murphy*, *supra*, 40 Cal.4th at p. 1116.) The parties engaged in discovery and the case was set for trial de novo on December 11, 2006; the parties settled on the first day of trial.

Substantial evidence supports the trial court's conclusion that the equitable tolling doctrine applied. Regarding the first element, the " ' "timely notice requirement essentially means that the first claim must have been filed within the statutory period. Furthermore[,] the filing of the first claim must alert the defendant in the second claim of the need to begin investigating the facts which form the basis for the second claim. Generally this means that the defendant in the first claim is the same one being sued in the second." ' " (*McDonald*, *supra*, 45 Cal.4th at p. 102, fn 2, quoting *Collier v. City of Pasadena* (1983) 142 Cal.App.3d 917, 924.) Bain promptly filed his claim with the Labor Commissioner 11 days after he resigned, well within the limitations period, and the defendants in both the administrative action and the judicial action were the same.

The second element (lack of prejudice to the defendant) " ' "essentially translates to a requirement that the facts of the two claims be identical or at least so similar that the defendant's investigation of the first claim will put him in a position to fairly defend the second." ' " (*McDonald*, *supra*, 45 Cal.4th at p. 102, fn 2.) Here, both claims were almost identical and involved Bain's unpaid wages and whether Bain was an employee or an independent contractor. TRI received prompt notice of the wage claim and an opportunity to investigate it. TRI filed a written response to the administrative claim and participated in the trial before the Labor Commissioner. TRI appealed the Labor Commissioner's decision, conducted discovery, and prepared for the trial de novo. Griffin was the only witness for TRI; he appeared at both the administrative hearing before the Labor Commissioner and for the trial de novo in the superior court. All of this

23

activity on the administrative claim gave TRI ample opportunity to prepare its defense. Moreover, TRI does not argue that it was prejudiced in this regard.

The third element " ' "of good faith and reasonable conduct on the part of the plaintiff is less clearly defined in the cases. But in *Addison . . .* , *supra*, 21 Cal.3d 313[,] the Supreme Court did stress that the plaintiff filed his second claim a short time after tolling ended." ' " (*McDonald*, *supra*, 45 Cal.4th at p. 102, fn 2, quoting *Downs v. Department of Water & Power* (1997) 58 Cal.App.4th 1093, 1100.) TRI does not argue a lack of good faith and reasonable conduct by Bain. After the first case was settled, the court set the matter for hearing on the dismissal calendar on February 8, 2007. Although a defendant generally prepares a release, TRI did not send Bain a release until March 2007; the parties disputed the language of that release for several months. In January 2008, Bain's counsel forwarded a proposed release to TRI's counsel. Although Griffin testified that Bain's release was consistent with the terms of the settlement the parties had agreed to on the record, TRI's counsel disputed the applicability of certain terms, given the passage of time. Based on their letters, it appears that throughout this time, both counsel believed the court still had jurisdiction to hear a motion to enforce the settlement (Code Civ. Proc., § 664.6). It is not clear when they learned that the case had been dismissed. The attorneys last corresponded about Bain's proposed release on January 31, 2008, and at that time appeared to believe that a motion to enforce was available to them. Bain filed his civil action on May 7, 2008, a little more than three months later. Given Bain's active pursuit of his administrative claim and his repeated efforts to finalize the December 2006 settlement, there was sufficient evidence to support the court's implied finding that he acted in good faith.

The equitable tolling rule suspends the running of the limitations period through the date on which the decision in the first action becomes final. (*Elkins*, *supra*, 12 Cal.3d at p. 413, fn. 1.) The first superior court action (TRI's appeal of the Labor Commissioner's decision) was dismissed on February 8, 2007; that order became final 60

24

days later on April 9, 2007. (Cal. Rules of Court, rule 8.104(a).) Three years from that date is April 9, 2010. Therefore, Bain's complaint, filed on May 7, 2008, was timely as to his statutory wage claims under sections 201, 202, 203, and 1194 since they are subject to a three-year limitations period.[9] However, Bain's claim for the section 1194.2 penalty, which is subject to a one-year limitations period, is barred since his complaint was filed more than one year after the decision in the first action became final.

TRI argues that equitable tolling does not apply because the doctrine was designed to "*protect* a plaintiff who inadvertently pursues a remedy in the *incorrect* forum, and as a result, delays filing in the *correct* forum until the statute of limitations has expired." TRI contends that since Bain filed his first claim in a correct forum, he cannot rely on equitable tolling because he had an adequate legal remedy and used it. TRI relies on three cases: *Addison*, *Elkins* and *Jones*.

The plaintiffs in *Addison* filed a timely tort action against the state and county in federal court alleging violations of state and federal law. After holding that the plaintiffs could not state a claim under federal law, the court dismissed the federal claim and decided not to retain jurisdiction over the state law claims. The plaintiffs then filed their action, after the limitations period had run, in state court. But they did so before the federal court filed its dismissal order. Our high court held that the limitations period was tolled while the action was pending in federal court. (*Addison*, *supra*, 21 Cal.3d at pp. 315-316.)

The plaintiff in *Elkins* filed a workers' compensation action. After the appeals board concluded that he was not entitled to compensation benefits because he was not an

---

[9] Non-statutory actions for unpaid wages are subject to the limitations period governing breach of contract actions generally. Since Bain did not have a written contract of employment, the applicable limitations period would be two years (Code Civ. Proc., § 339 [oral agreements]). (*Cuadra, supra,* 17 Cal.4th at p. 859.) But even if the two-year limitations period applied, Bain's claims would still be timely, because of the equitable tolling.

25

employee, the plaintiff filed an untimely civil action against the same defendant. The court held that the statute of limitations was tolled while the plaintiff pursued his workers' compensation remedy. (*Elkins*, *supra*, 12 Cal.3d at pp. 412-413.)

The plaintiff in *Jones* filed a wage discrimination claim in state court. The court in that case reversed a summary judgment because there were triable issues whether the limitations period on the plaintiff's claim was tolled while she pursued her federal administrative remedy. (*Jones*, *supra*, 27 Cal.3d at pp. 107-109.)

In *Addison*, *Elkins* and *Jones*, the Supreme Court held that equitable tolling applies "when an injured person has several formal legal remedies and reasonably and in good faith pursues one." (*Jones*, *supra*, 27 Cal.3d at p. 108.) The test is not whether the first action was brought in the correct forum or an incorrect forum as TRI asserts, but whether the person acted reasonably and in good faith. In this case, when faced with a choice of forums, Bain reasonably and in good faith pursued his claim before the Labor Commissioner. Contrary to TRI's assertion, Bain's administrative claim was never resolved. Although Bain prevailed before the Labor Commissioner, TRI requested a trial de novo in the superior court, purported to settle the case, and then refused to complete the settlement. Bain's claims were dismissed for reasons that had nothing to do with the merits of his case.

Citing *Wood v. Elling* (1977) 20 Cal.3d 353 (*Wood*) and *Thomas, supra,* 95 Cal.App.4th 427, TRI also argues that Bain is not entitled to equitable tolling because "he had his prior timely lawsuit dismissed in February 2007 and then raised the same claims in a second lawsuit." TRI's reliance on both cases is misplaced.

The plaintiff in *Wood* sued two individuals and two corporations. Summons was promptly served on the individuals, but not the corporations. The corporations were later dismissed for delay in service of summons. After obtaining a judgment against the individual defendants, the plaintiff filed a second action in the same court, seeking to hold the corporations jointly and severally liable for that judgment on an alter ego theory.

26

(*Wood*, *supra*, 20 Cal.3d at pp. 357-358.) The Supreme Court held that when a case is dismissed for failure to serve summons or bring the matter to trial within the statutory time limits (former Code Civ. Proc., §§ 581a, 583), the statute of limitations applies as if the prior action had never been brought. (*Wood*, at p. 360.) The court distinguished *Elkins*, reasoning that *Wood* did not involve a claim that could be brought in two different forums and instead involved "a plaintiff's failure to diligently pursue the sole avenue of legal recourse available to him." (*Id.* at p. 360, fn. 4.)

*Thomas* was a medical malpractice case in which the plaintiff's attorney was set for trial in two separate cases on the same day. Rather than pursue other procedural remedies, the attorney dismissed Thomas's action and re-filed it the same day, reasoning that since the plaintiff filed the first action within three months of discovering the malpractice, "the remaining nine months were tolled during the pendency of the first complaint and did not commence to run until he dismissed the first action." (*Thomas*, *supra*, 95 Cal.App.4th at p. 430.) The court concluded that equitable tolling did not apply because "Thomas did not have any alternate remedies. His claim was the single pursuit of a medical malpractice action. But even more obviously, Thomas did not act reasonably or with any semblance of good faith." (*Id.* at p. 434.) Thomas's attorney did not advise opposing counsel of the scheduling conflict or request a trial continuance from the court. Instead, he "endeavored to solve the mismanagement of his calendar conflict without regard to the interests of [the] defendant or the court and contrary to conventional procedures available to him." (*Id.* at p. 435.)

This case is distinguishable from *Wood* and *Thomas*. First, unlike the plaintiffs in those cases, Bain's wage claims could be brought in two alternate forums. Second, Bain's claim was not dismissed for failing to serve summons or bring the case to trial within the statutory deadlines and there was no evidence Bain filed his second action to remedy calendar mismanagement or for any other improper purpose. Bain diligently pursued his claim before the Labor Commissioner and obtained an award in that

27

proceeding. The first lawsuit in the superior court was TRI's appeal of the Labor Commissioner's decision and Bain continued to pursue his claims throughout that appeal. Thus, the trial court did not err when it found that the limitations period on Bain's judicial action to recover wages based on violations of Labor Code sections 201, 202, 203, and 1194 was equitably tolled while Bain pursued his administrative claim before the Labor Commissioner.

Finally, TRI argues that even if Bain's judicial action was timely, his claim for minimum wages under section 1194 was barred, since he did not make a claim under section 1194 in the administrative proceeding. The record contains both Bain's "Initial Report or Claim" and the "Complaint" he filed with the Labor Commissioner. Both documents claim unpaid wages without specifying which Labor Code provisions wages were sought under. Bain's claim that he was never paid any wages necessarily includes the allegation that he was not paid even minimum wages. In addition, since the appeal of the Labor Commissioner's decision was a trial de novo, the trial court had the discretion to permit Bain to raise additional related wage claims. (*Murphy*, *supra*, 40 Cal.4th at p. 1115.) We do not have a complete record of the proceedings in the first action in the superior court (TRI's appeal of the Labor Commissioner's decision) and therefore do not know whether Bain relied on section 1194 in that case. We conclude that TRI has not met its burden of demonstrating that the section 1194 minimum wage claims were barred.

## B. Presumption of Employment

TRI next argues that the judgment must be reversed because the court erroneously relied on the presumption that every person who performs services for another is an employee. TRI contends this is "a fundamentally incorrect statement of the law" and that in determining whether Bain was an employee or an independent contractor, the court should have followed "the controlling case" of *S. G. Borello, supra,* 48 Cal.3d 341, which

28

requires the court to consider all of the circumstances and analyze a number of factors, the most important being whether the employer had the right to control the work.

Bain argues that even if the court erred in applying the presumption, the error was harmless. Bain asserts that TRI does not point to any substantial evidence that he was not an employee and argues that even if the presumption did not apply, the only conclusion from the uncontested facts is that he was an employee.

Indeed, the analysis in the court's statement of decision begins with the presumption that Bain was an employee. On this point, the court cited sections 3357 and 3353. Section 3357 provides: "Any person rendering service for another, other than as an independent contractor, or unless expressly excluded herein, is presumed to be an employee." This section has been interpreted as creating a presumption that a service provider is presumed to be an employee unless the principal proves otherwise. (*Yellow Cab Cooperative, Inc. v. Workers' Comp. Appeals. Bd*. (1991) 226 Cal.App.3d 1288, 1292-1293.) Section 3353 provides: " 'Independent contractor' means any person who renders service for a specified recompense for a specified result, under the control of his principal as to the result of his work only and not as to the means by which such result is accomplished." "Unless the context otherwise requires," the definitions in sections 3351 through 3371 apply to Division 4 of the Labor Code, which governs workers' compensation. (§ 3350.)

The trial court also cited *Robinson v. George* (1940) 16 Cal.2d 238 (*Robinson*). *Robinson* was a personal injury action in which the plaintiff alleged that a negligent driver (defendant George) was the corporate defendant's employee, making the corporate defendant vicariously liable for injuries the plaintiff sustained in a motor vehicle accident. (*Id.* at p. 240.) The Supreme Court held "[t]he rule, . . . , is that the fact that one is performing work and labor for another is prima facie evidence of employment and such person is presumed to be a servant in the absence of evidence to the contrary." (*Id.* at p. 242.) The court also noted that this presumption may be rebutted by evidence that

29

the alleged employee was an independent contractor. (*Ibid.*) TRI argues that the court erred in relying on *Robinson*, because the reasoning in *Robinson* was criticized in *Fillmore v. Irvine* (1983) 146 Cal.App.3d 649, 659, a decision of the Court of Appeal. But *Robinson* has never been overruled and we are bound to follow it. (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455.)

In addition, the trial court cited *Cristler v. Express Messenger Systems, Inc.* (2009) 171 Cal.App.4th 72 (*Cristler*), a class action in which the plaintiffs alleged that the defendant parcel delivery company improperly classified them as independent contractors. The plaintiffs in *Cristler* alleged Labor Code violations, including failure to pay overtime compensation (§§ 510, 515, 1194), failure to provide properly itemized wage statements (§ 226), and failure to compensate for business expenses (§ 2802), as well as claims not based on the Labor Code. (*Cristler*, at pp. 75-76.) The appellate court in *Cristler*, like the trial court here, began its analysis with the definitions of "employee" and "independent contractor" in sections 3351, 3353, and 3357. (*Id.* at pp. 76-77.) Thus, *Cristler* provides authority for applying the definitions in sections 3353 and 3357 to wage claims. (*Ibid.*)

In setting forth its multi-factor test, the *S. G. Borello* court relied on the traditional common law test from the Restatement of Agency, the standards for contractor's licensees in section 2750.5, and a test applied in other jurisdictions; it noted that many of the factors in those tests overlapped. (*S. G. Borello*, *supra*, 48 Cal.3d at pp. 351, 354-355.) The court stated that the most important factor is "the right to control the manner and means of accomplishing the result desired" and that the right to discharge at will, without cause, is " '[s]trong evidence in support of an employment relationship.' " (*Id.* at p. 350.) Other factors "include (a) whether the one performing services is engaged in a distinct occupation or business; (b) the kind of occupation, with reference to whether, in the locality, the work is usually done under the direction of the principal or by a specialist without supervision; (c) the skill required in the particular occupation; (d) whether the

principal or the workman supplies the instrumentalities, tools, and the place of work for the person doing the work; (e) the length of time for which the services are to be performed; (f) the method of payment, whether by the time or by the job; (g) whether or not the work is a part of the regular business of the principal; and (h) whether or not the parties believe they are creating the relationship of employer-employee." (*Id*. at p. 351.) The trier of fact may also consider: (1) the opportunity for profit or loss; (2) the investment in equipment or materials required for the task, (3) the employment of helpers; and (4) whether the service rendered is an integral part of the alleged employer's business." (*Id*. at pp. 354-355.) The "individual factors cannot be applied mechanically as separate tests; they are intertwined and their weight depends often on particular combinations.' " (*Ibid*.) "Each service arrangement must be evaluated on its facts, and the dispositive circumstances may vary from case to case." (*Id*. at p. 354.) *S. G. Borello's* "caveats reflect that '[t]he determination of employee or independent-contractor status is one of fact," which we review under the substantial evidence standard. (*Cristler*, *supra*, 171 Cal.App.4th at pp. 77-78.)

We are not persuaded that the court erred when it applied a presumption of employment in this case. As we have noted, the Supreme Court has applied the presumption in a personal injury case based on the employer's vicarious liability. (*Robinson*, *supra*, 16 Cal.2d at p. 242.) Although the Supreme Court did not specifically speak in terms of a presumption in *S. G. Borello*, its analysis relied on the "standards" in section 2750.5, which contains a presumption of employment. (*S. G. Borello, supra,* 48 Cal.3d at p. 354.) And *Cristler* applied section 3357, which has been construed as a presumption of employment, to wage claims similar to those at issue here. (*Cristler*, *supra*, 171 Cal.App.4th at pp. 75-76.)

But even if it was error for the court to begin its analysis with the presumption, it is evident from its factual findings that the court properly analyzed the evidence according to the multi-factor test from *S. G. Borello*. The court found that TRI controlled

Bain's employment by requiring him to attend staff meetings, to record his hours on the same time sheets as other employees, to perform the same administrative duties as other employees; by deciding which projects Bain worked on and which hours he worked; and by having his work audited by its night auditor before it went out. TRI set the fee schedule and collected fees from the clients. TRI provided the supplies and equipment, except for some of Bain's furniture, which he had lent to the company. Bain did not have any outside clients for whom he performed tax preparation services; all of his services were provided to TRI's clients, except for the volunteer work Bain did for LAMTA. TRI marketed Bain and his skills to clients as an employee, not an independent contractor. Bain was employed on an at-will basis. TRI employed Bain as a tax preparer, which was an integral part of TRI's business. Bain had not invested in any tax preparation business from which he could make a profit, he did not market or advertise his tax preparation services, and he never used his own employees or subcontractors to do TRI's work. TRI also reimbursed Bain for his client-related expenses and never required Bain to invoice TRI for his services.

As the trial court noted, that Bain and Conard treated Bain as an independent contractor or that Conard listed Bain as a "consultant" on the profit and loss statement he provided to TRI is not determinative. "The label placed by the parties on their relationship is not dispositive, and subterfuge will not be countenanced." (*S. G. Borello*, *supra*, 48 Cal.3d at p. 349.) Moreover, there was evidence that Bain and Conard were aware of this rule and intended to treat their relationship as one of employer and employee starting in January 2005, the time that TRI took over the practice. The court found that Bain always thought he was TRI's employee and that TRI's evidence that the parties had agreed Bain would be an independent contractor was not credible. In addition, that Conard did not withhold taxes and issued Bain a 1099 is not dispositive; such conduct is a consequence of their agreement to treat Bain as an independent

contractor and not a means of proving independent contractor status. (*Toyota Motor Sales U.S.A., Inc. v. Superior Court* (1990) 220 Cal.App.3d 864, 877.)

As set forth in the Facts section of this opinion, there was substantial evidence that supported each of the trial court's findings, and the findings support the court's conclusion that Bain was TRI's employee and not an independent contractor. For these reasons, we reject TRI's contention that the court erred when it began its analysis with the presumption that Bain was an employee and conclude, contrary to TRI's assertion, that the court properly applied the multi-factor test from *S. G. Borello*.

## C. Statutory Penalties

### 1. Parties' Contentions

TRI argues that the court erred when it awarded Bain both the penalty for failing to pay minimum wages (§ 1194.2) and the penalty for failing to timely pay earned wages upon resignation (§ 203). TRI argues that there is no legal authority that supports imposing both penalties and that the Supreme Court rejected the trial court's "expansive" interpretation of section 1194 in *Kirby v. Immoos Fire Protection, Inc.* (2012) 53 Cal.4th 1244 (*Kirby*). TRI also contends that if the section 1194.2 penalty applies, the court miscalculated the amount of the penalty. And TRI argues that the court should not have imposed the section 203 penalty because there was a good faith dispute over whether TRI owed Bain "wages."

Bain argues that TRI waived its challenge to the amount of the section 1194.2 penalty by failing to object to the statement of decision on that ground, that he is entitled to the full amount of his unpaid wages as the section 1194.2 penalty, and that the court properly imposed the section 203 penalty.

Since we conclude that Bain's claim for the section 1194.2 penalty was barred by the statute of limitations, we shall not address TRI's contention that the court erred when

it imposed both the section 203 penalty and the section 1194.2 penalty or its contention that the court erred in determining the amount of the section 1194.2 penalty. In light of our holding, we shall modify the judgment by striking the $7,700 awarded as liquidated damages under section 1194.2, since that claim was time barred. We turn next to the question whether the court erred in imposing the section 203 penalty in this case.

## 2. *Propriety of Imposing Section 203 Penalty*

TRI contends the court should not have imposed the section 203 penalty because there was a good faith dispute over whether TRI owed Bain "wages." Bain contends the court properly imposed the section 203 penalty because TRI has never disputed that it owed Bain $7,700; instead the dispute has always been about how that payment should be characterized. Bain argues that TRI's continued refusal to pay is "in bad faith and outrageous."

Section 203 provides in relevant part: "If an employer *willfully* fails to pay, without abatement or reduction, in accordance with Sections 201, . . . , 202, and . . . , any wages of an employee who is discharged or who quits, the wages of the employee shall continue as a penalty . . . ." (Italics added.) The section 203 penalty is commonly known as a "waiting time" penalty. (*FEI Enterprises, Inc. v. Yoon* (2011) 194 Cal.App.4th 790, 801 (*FEI*).)

"The settled meaning of 'willful,' as used in section 203, is that an employer has intentionally failed or refused to perform an act which was required to be done. [Citations.] '[T]he employer's refusal to pay need not be based on a deliberate evil purpose to defraud workmen of wages which the employer knows to be due.' " (*Amaral v. Cintas Corp. No. 2* (2008) 163 Cal.App.4th 1157, 1201 (*Amaral*), citing *Barnhill v. Robert Saunders & Co.* (1981) 125 Cal.App.3d 1, 7-8 (*Barnhill*) and *Davis v. Morris* (1940) 37 Cal.App.2d 269, 274.)

As discussed in *Amaral*, "[i]n *Barnhill*, [the] court considered whether an employer's failure to pay wages is 'willful' if its legal duty to pay them is unclear at the time of the violation. When the employee in *Barnhill* was discharged, she owed her employer a balance on a promissory note, which was intended to be repaid in installments by payroll deductions. [Citation.] The employer set off the balance due on the promissory note against the final wages paid to the employee, and the employee sued to recover her full wages plus waiting time penalties under section 203. [Citation.] The trial court awarded both wages and penalties, but [the appellate court] reversed the penalty award. Although ultimately determining the setoff was not permissible, [the court] noted that the state of the law was not clear at the time the employer withheld wages, and several California appellate decisions approved of such setoffs. [Citation.] '[G]iven that uncertainty,' [the court] reasoned, '[the employer] should not be penalized for believing that setoff was proper and payment of wages not required.' [Citation.] Accordingly, the employer's nonpayment of wages was not willful for purposes of section 203." (*Amaral*, *supra*, 163 Cal.App.4th at p. 1201, citing *Barnhill*, *supra*, 125 Cal.App.3d at pp. 4-5, 8-9.)

*Barnhill*'s holding was memorialized in California Code of Regulations, title 8, section 13520, which states: "A willful failure to pay wages within the meaning of . . . Section 203 occurs when an employer intentionally fails to pay wages to an employee when those wages are due. However, a good faith dispute that any wages are due will preclude imposition of waiting time penalties under Section 203. [¶] (a) Good Faith Dispute. A 'good faith dispute' that any wages are due occurs when an employer presents a defense, based in law or fact which, if successful, would preclude any recover[y] on the part of the employee. The fact that a defense is ultimately unsuccessful will not preclude a finding that a good faith dispute did exist. Defenses presented which, under all the circumstances, are unsupported by any evidence, are unreasonable, or are presented in bad faith, will preclude a finding of a 'good faith dispute.' " (Cal. Code Regs., tit. 8,

35

§ 13520; *Amaral*, *supra*, 163 Cal.App.4th at p. 1201.) "This regulation imposes an objective standard." (*FEI*, *supra*, 194 Cal.App.4th at p. 802.) "The appearance of the language 'or are presented in bad faith' in the list of circumstances precluding a finding of a good faith dispute does not render the test a subjective one, but indicates that subjective bad faith may be of evidentiary value in the objective bad faith analysis." (*Id.* at p. 802, fn. 9.)

Nothing requires that a good faith dispute exist at the time the wages are due. The regulation defines a good faith dispute in part as a "defense." "Precisely when the employer formulated such a defense is, . . . beside the point. So long as no other evidence suggests the employer acted in bad faith, presentation of a good faith defense, based in law or fact, will negate a finding of willfulness." (*Amaral*, *supra*, 163 Cal.App.4th at p. 1204.)

A review of the case law aids our analysis. In *Amaral*, the trial court found that the employer, Cintas (a uniform supplier), violated a city living wage ordinance (LWO) by failing to pay wages at the rate required by the LWO to employees who performed work on the city's contracts outside the city. The trial court awarded unpaid wages but found that the existence of a good faith defense precluded imposition of waiting time penalties. (*Amaral*, *supra*, 163 Cal.App.4th 1170-1171, 1173-1174.) The appellate court affirmed. The court explained, "the legal obligations imposed on employers by the LWO were unclear at the time of Cintas's violations. As Cintas's vigorous defense . . . has made clear, numerous arguments exist concerning the constitutionality of the LWO and its proper interpretation. Before the trial court rulings in this case, no court had previously addressed the scope or the validity of the City's LWO. Living wage ordinances such as the one at issue here are a relatively recent phenomenon. Indeed, until now, . . . no California appellate decision has construed the requirements of any . . . living wage ordinance, or addressed the constitutional challenges . . . that Cintas has raised. Although we have rejected Cintas's legal arguments about the LWO, these defenses were

36

not unreasonable or frivolous. On the contrary, they raised complicated issues of first impression" (*Id.* at p. 1202.) In addition*,* there was no evidence the employer knew it was required to compensate its production workers at the rates prescribed in the LWO, or showing the company acted in bad faith when it failed to pay such rates." (*Ibid.*)

In contrast to *Barnhill* and *Amaral*, the courts in *Armenta v. Osmose, Inc.* (2005) 135 Cal.App.4th 314 (*Armenta*) and *Road Sprinkler Fitters Local Union No. 669 v. G & G Fire Sprinklers, Inc*. (2002) 102 Cal.App.4th 765 (*Road Sprinkler*), rejected claims that there was a good faith dispute that precluded imposing a section 203 penalty. The employer in *Armenta* maintained wood utility poles for major utility companies; the employees claimed unpaid wages for time they spent traveling to and from remote jobsites in company trucks, attending crew meetings, maintaining the trucks, completing paperwork, and other tasks the employer referred to as "nonproductive time." (*Armenta*, at pp. 316-319.) Although the *Armenta* court observed that California law was unsettled regarding the propriety of using "an average hourly wage to determine whether the minimum wage law was violated," that court concluded that the presumption of good faith that this legal uncertainty might have given the employer was outweighed by evidence that the employer was in fact aware that its employees were not being fully compensated for their time. (*Id.* at pp. 325-326.) The court concluded that the trial court's findings that the employer's "supervisors created an environment in which the foremen were strongly discouraged from recording time spent . . . performing nonproductive tasks" and evidence that the workers "raised the issue to supervisors but were told by supervisors and area managers that they would not be compensated for such time" showed that the employer's "failure to pay for nonproductive time was intentional and willful" and supported imposition of the penalty. (*Id.* at p. 326.) Applying substantial evidence review, the appellate court upheld the trial court's finding of willfulness. (*Id.* at pp. 325-327.)

The same substantial evidence analysis led to the affirmance of section 203 penalties in *Road Sprinkler*. The court in *Road Sprinkler* distinguished *Barnhill* because the employer's legal obligation was clear and substantial evidence supported the lower court's finding that the employer had acted in bad faith. (*Road Sprinkler*, *supra*, 102 Cal.App.4th at pp. 781-783.) Thus, any legal mistake the employer claimed to have made was not reasonable and not made in good faith. (*Id*. at pp. 782-783.)

TRI argues that the court erred in imposing the waiting time penalty because at all times it had a good faith belief that Bain was not an employee. TRI relies on the following facts: (1) Conard's profit and loss statement listed Bain as a "consultant" and showed that that he was paid without deduction for taxes; (2) Griffin saw the 1099 form that Conard gave Bain for 2004; (3) Griffin believed Bain was an independent contractor when he gave Bain the independent contractor agreement; and (4) Bain responded to that contract by asking to be treated as an employee. As we have explained, it has long been the rule that neither "[t]he label placed by the parties on their relationship" nor the failure to withhold taxes/use of a 1099 form is dispositive. (*S. G. Borello*, *supra*, 48 Cal.3d at p. 349; *Toyota Motor Sales U.S.A., Inc, supra,* 220 Cal.App.3d at p. 877.) In addition, the trial court found that Griffin's testimony that the parties had agreed Bain would be an independent contractor was not credible. That Bain asked to be treated as an employee when presented with the independent contractor agreement does not support the conclusion that he was an independent contractor before then.

TRI relies on the fact that it offered to pay Bain his compensation in February and March 2005. But those offers were contingent on Bain executing the independent contractor agreement. The requirement that an employer pay earned wages upon resignation is unconditional; the employer may not condition the payment of such wages in the employee's execution of a release or other conduct by the employee. (*Singh v. Southland Stone, U.S.A., Inc*. (2010) 186 Cal.App.4th 338, 362-365.) More importantly, although TRI offered to pay Bain in 2005, it never tendered a check. TRI admits that it

had the financial ability to pay Bain in February 2005. It argues that the only reason it did not pay Bain at that time was a good faith belief that he was an independent contractor, not an employee.

There is nothing novel about the rules governing the employee-independent contractor analysis. The analysis in *S. G. Borello* has been around for two decades. (*S. G. Borello*, *supra*, 48 Cal.3d at pp. 351-355 [1989].) Thus, unlike *Amaral* and *Barnhill*, this case does not involve an area of the law that is unsettled. There was also evidence that upon completing some professional training, Bain and Conard realized that they had misclassified Bain as an independent contractor. A reasonable inference from this evidence is that Griffin, who was also a tax preparer, should have known that Bain was an employee. And whether characterized as an employee or an independent contractor, Bain was entitled to be paid for his work. TRI did not claim that Bain did not complete his work assignments or provide any other explanation for its refusal to pay Bain for his services, regardless of the label used. The record and the law support the trial court's conclusion that TRI intentionally withheld Bain's wages and that it did not have a good faith belief that Bain was not an employee. For these reasons, we conclude the court did not err in imposing the section 203 penalty.

## II. Bain's Cross-Appeal

Bain challenges the court's rulings that Griffin cannot be held personally liable for Bain's wage claims under the Labor Code. As we have noted, the trial court rejected this contention twice: (1) when it granted Griffin's motion for summary judgment; and (2) when it denied Bain's motion to amend his complaint at trial to add Griffin as a defendant. We shall address each ruling separately.

## A. Order Granting Griffin's Motion for Summary Judgment

In an introductory portion of his brief, Bain states that he is appealing from both the order denying his request to amend at trial and the order on Griffin's motion for summary judgment. Although Bain's summary of the procedural history mentions Griffin's motion for summary judgment, the argument portion of his brief does not. Bain does not discuss the standard of review for a motion for summary judgment or any of the evidence or argument presented in Griffin's motion for summary judgment.

In addition, the record on appeal does not contain copies of Griffin's moving papers (his points and authorities, separate statement, and the evidence filed in support of his summary judgment motion) or any of Bain's papers in opposition to the motion (his points and authorities, separate statement, and evidence). The only documents in the record relating to Griffin's motion for summary judgment are Griffin's reply to the opposition and the court's order on the motion.

One of the most fundamental rules of appellate review is that an appealed judgment or order is presumed to be correct. " 'All intendments and presumptions are indulged to support it on matters as to which the record is silent, and error must be affirmatively shown.' " (*Denham v. Superior Court* (1970) 2 Cal.3d 557, 564; *Cahill v. San Diego Gas & Electric Co*. (2011) 194 Cal.App.4th 939, 956.) The appellant (Bain on the cross-appeal) has the burden of overcoming the presumption of correctness. That burden includes providing this court with reasoned argument and citations to authority on each point raised. (*Niko v. Foreman* (2006) 144 Cal.App.4th 344, 368; *Cahill*, *supra*, at p. 956.) When the appellant asserts a point but fails to support it with reasoned argument and citations to authority, the appellate court may treat it as waived or forfeited, and pass it without consideration. (*People v. Stanley* (1995) 10 Cal.4th 764, 793; see, e.g., *Taylor v. Roseville Toyota, Inc*. (2006) 138 Cal.App.4th 994, 1001, fn. 2 [contention forfeited, where it is "merely asserted without argument or authority"].) In addition, the appellant

must provide this court with an adequate record demonstrating the alleged error. Failure to provide an adequate record on an issue requires that the issue be resolved against the appellant. (*Maria P. v. Riles* (1987) 43 Cal.3d 1281, 1295; see e.g., *EnPalm, LLC v. Teitler Family Trust* (2008) 162 Cal.App.4th 770, 775 [issue deemed waived where appellant failed to support claim by argument, analysis or citation to the record, or to include any trial proceedings in appellate record].)

As set forth above, Bain has failed to provide this court with an adequate record of the proceedings on Griffin's summary judgment motion and provides no argument or authority regarding that motion. We therefore conclude that Bain has forfeited any claim of error related to the order on Griffin's motion for summary judgment.

## B. Order Denying Bain's Motion to Amend at Trial

Citing *Martinez,* Bain argues that the court erred when it denied his motion to amend because both Griffin and TRI were employers for the purposes of his claim for unpaid wages. Relying on the definition of "employer" in Industrial Welfare Commission (IWC) wage orders, Bain contends that Griffin was an employer because he controlled Bain's wages, hours, and working conditions, and that Griffin should therefore be held jointly and severally liable with TRI for the judgment.

Bain relies on what is commonly referred to as IWC Wage Order No. 4-2001 (hereafter Wage Order No. 4), which regulates wages, hours, and working conditions in "professional, technical, clerical, mechanical, and similar occupations." (Cal. Code. Regs., tit. 8, § 11040, subd. (1); *Brinker Restaurant Corp. v. Superior Court* (2012) 53 Cal.4th 1004, 1026.) Wage Order No. 4, like all of the industry and occupation wage orders, defines "employer" as "any person as defined in Section 18 of the Labor Code, who directly or indirectly, or through an agent or any other person, employs or exercises control over the wages, hours, or working conditions of any person." (Cal. Code. Regs., tit. 8, § 11040, subd. (2)(H); *Martinez*, *supra*, 49 Cal.4th at p. 59.) Section 18 defines

41

"person" as "any person, association, organization, partnership, business trust, limited liability company, or corporation." Both Griffin and TRI (a corporation) are "persons" who may be employers under Wage Order No. 4.

Our Supreme Court first construed the definition of "employer" used in the IWC wage orders in *Reynolds, supra,* 36 Cal.4th 1075. The plaintiff in *Reynolds*, a former employee of an auto painting company, brought a class action suit to recover unpaid overtime compensation against the company (a Delaware corporation) and its California subsidiary (also a corporation), alleging violations of Labor Code sections 510 and 1154 and the applicable wage order. (*Id.* at pp. 1081-1082.) The plaintiff subsequently added eight individuals who were officers, directors, and shareholders of the corporations as defendants. (*Id.* at p. 1083.) The individual defendants demurred, arguing that they were not the plaintiff's employers. (*Ibid.*) Noting that neither section 510 nor section 1194 defined the term " 'employer,' " the plaintiff argued that the IWC wage order definition (which includes individuals who exercise control over wages, hours, or working conditions) applied and that the IWC definition includes corporate control figures like the individual defendants. (*Id.* at p. 1085.) The court disagreed, explaining that "the plain language of [the wage order] defining employer does not expressly impose liability under section 1194 on individual corporate agents. Nor can we infer that the Legislature, simply by amending sections 510 and 1194 several times after the IWC adopted its employer definition, impliedly intended to incorporate that definition into a unified remedial scheme comprised of those statutes and the regulations." (*Id.* at p. 1086.) The court applied the common law test of employment and observed that "[u]nder the common law, corporate agents acting within the scope of their agency are not personally liable for the corporate employer's failure to pay its employees' wages." (*Id.* at p. 1087.) The court therefore concluded that the plaintiff could not state a section 1194 violation against the individual defendants. (*Id.* at pp. 1087-1088.) The court also held that while corporate directors may be "jointly liable with the corporation and may be joined as

42

defendants if they personally directed or participated in [] tortious conduct," the failure to comply with wage laws is not tortious conduct. (*Id.* at pp. 1089-1090.) In addition, the plaintiff did not allege that the individual defendants misappropriated the alleged unpaid wages to themselves for their individual advantage. (*Id.* at p. 1090.)

Bain argues that the rule from *Reynolds* does not apply to Griffin since *Reynolds* was "found only under common law." He contends, instead, that he is entitled to rely on the definition of "employer" in Wage Order No. 4, as construed in *Martinez*, *supra*, 49 Cal.4th 35, which was decided after *Reynolds*.

In *Martinez*, the Supreme Court revisited the question of who is an employer for the purpose of an action for unpaid minimum wages (§ 1194). The plaintiffs in *Martinez* were agricultural workers who sued their employer, a grower, for unpaid minimum wages. The named defendants included two produce merchants, through whom the grower sold strawberries, and a field agent for one of the merchants. Based on the definition of "employer" in the applicable IWC wage order, the plaintiffs argued that the produce merchants, the field agent, and the grower were joint employers and that the merchants and the field agent were therefore liable for the unpaid wages. (*Martinez*, *supra*, 49 Cal.4th at pp. 42-43, 48.) The grower had obtained a discharge in bankruptcy. (*Id.* at p. 42.)

The *Martinez* court observed that although section 1194 was enacted in 1913, the court had only addressed the question of how employment should be defined under section 1194 once, in *Reynolds*, and that it had never reviewed the concept of joint employment in the context of wage claims brought under state law. (*Martinez*, *supra*, 49 Cal.4th at p. 50.) The court stated that *Reynolds* "spoke too broadly in concluding that the common law defines the employment relationship in actions under section 1194." (*Id.* at p. 50, fn. 12.) After conducting an extensive examination of section 1194 and the IWC wage orders in their "full historical and statutory context," the court concluded that the wage orders define the employment relationship, and thus who may be held liable as

43

an employer for unpaid wages. (*Id.* at pp. 52-63.) The court observed that "a worker who sues under section 1194 for unpaid minimum wages actually sues to enforce the applicable wage order." (*Martinez*, at p. 64.) The court stated, "While the common law definition of employment plays an important role in the wage orders' definition, and . . . in actions under section 1194, to apply only the common law definition while ignoring the rest of the IWC's broad regulatory definition would substantially impair the commission's authority and the effectiveness of its wage orders." (*Id.* at p. 65.) The court held that under the wage orders, "to employ" has three alternative definitions. (*Id.* at pp. 64, 66.) "It means: (a) to exercise control over the wages, hours or working conditions, *or* (b) to suffer or permit to work, *or* (c) to engage, thereby creating a common law employment relationship." (*Id.* at p. 64.) "This is not to say the common law plays no role in the IWC's definition of the employment relationship. In fact, the IWC's definition of employment incorporates the common law definition *as one alternative*." (*Ibid.*) The court stated that the wage orders' definition of "employer," "is broad enough to reach through straw men and other sham arrangements to impose liability for wages on the actual employer." (*Id.* at p. 71.) In addition, "one of the reasons the IWC defined 'employer' in terms of exercising control was to reach situations in which multiple entities control different aspects of the employment relationship. This occurs, for example, when one entity (such as a temporary employment agency) hires and pays a worker, and another entity supervises the work." (*Id.* at p. 76.)

But *Martinez* did not overrule *Reynolds,* as Bain asserts. To the contrary, the court reaffirmed its holding in *Reynolds*, stating, "The opinion in *Reynolds*, . . . , properly holds that the IWC's definition of 'employer' does not impose liability on individual corporate agents acting within the scope of their agency. [Citation.] The opinion should not be read more broadly than that." (*Martinez*, 49 Cal.4th at p. 66.) Examining the relationship between the parties, the *Martinez* court concluded that the produce merchants were not joint employers and were therefore not liable for the plaintiffs' unpaid wages. (*Id.* at

44

p. 71-77.)  Addressing the liability of the field agent, the court again reaffirmed *Reynolds*, stating "The claim fails under our holding in *Reynolds*, . . . , that the IWC's definition of 'employer' does not impose liability on individual corporate agents acting within the scope of their agency." (*Martinez*, at p. 75, citing *Reynolds*, at p. 1086.)

Bain argues that Griffin meets all three alternative definitions of employer from *Martinez* because he controlled Bain's hours, working conditions, and whether Bain was paid.  However, Bain's contention ignores the court's holdings in *Reynolds*, which was reaffirmed in *Martinez*, that the wage orders' definition of "employer" does not impose liability on individual corporate agents acting within the scope of their agency. (*Martinez*, at p. 75.)  In this case, there was no evidence that Griffin acted outside the scope of his agency as an officer and a shareholder of TRI.  There is no allegation or evidence that Griffin misappropriated Bain's unpaid wages to himself for his individual advantage.  (*Reynolds*, *supra*, 36 Cal.4th at p. 1090.)  This case is also factually distinguishable from *Martinez*, because there was no evidence that supported the conclusion that Griffin was a joint employer with TRI.

Bain's reliance on *Futrell v. Payday California, Inc*. (2010) 190 Cal.App.4th 1419 is misplaced.  Applying the three-pronged definition from *Martinez*, the *Futrell* court held that a payroll processing company that provided payroll services to a producer of television commercials was not a joint employer for the purposes of the wage statutes. The payroll company exercised no control over the production company's employees, including their hiring or firing, rate of pay, work hours, or conditions; it did not "suffer" or permit the employees to work; and did not engage them in work.  (*Id.* at pp. 1430-1435.)  *Futrell* cited *Reynolds*, stating, "The extension of personal liability to the agents of an employer is not reasonably derived from the language and purposes of the Labor Code wage statutes." (*Id.* at p. 1432; accord *Aleksick v. 7-Eleven, Inc*. (2012) 205 Cal.App.4th 1176, 1186-1191 [franchisor who provided payroll services to franchisee was not a joint employer for the purposes of the wage statutes].)  Moreover, *Futrell* is

45

distinguishable on its facts, since Griffin is an officer and shareholder of the corporate employer, not a separate entity that provides services.

Following *Reynolds* and *Martinez*, we hold that Griffin was not an employer and could not be held personally liable for failing to pay Bain's wages. We therefore conclude that the court did not err when it denied Bain's motion to amend at trial.

### DISPOSITION

The trial court is directed to modify the judgment and strike the $7,700 in liquidated damages awarded as a penalty pursuant to section 1194.2. As so modified, the judgment is affirmed. Each side is to bear its own costs on appeal.

_____
Márquez, J.

WE CONCUR:

_____
Elia, Acting P. J.


_____
Mihara, J.


*Bain v. Tax Reducers, Inc.*
No. H037452

Trial Court:                              Santa Clara County Superior Court
                                          Superior Court No.: CV112065


Trial Judge:                              The Honorable
                                          Thomas P. Hansen


Attorneys for Plaintiff/Appellant         Richard D. Schramm
Harold C. Bain:                           Employment Rights Attorneys




Attorneys for Respondent/Appellant        John P. McDonnell:
Tax Reducers, Inc.:                       Myers, Hawley, Morley, et al.




*Bain v. Tax Reducers, Inc.*
**H037452**